**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TERESA A. ZERFA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 21-463 |
| | ) |
| ACOSTA, INC., d/b/a ACOSTA | ) |
| SALES AND MARKETING, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

**I.      INTRODUCTION**

Plaintiff Teresa A. Zerfa initiated this lawsuit pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. and Cons. Stat. § 951 *et seq.*, asserting that her former employer, Defendant Acosta, Inc., d/b/a/ Acosta Sales and Marketing ("Acosta"), discriminated against her on the basis of sex and pregnancy and retaliated against her because she engaged in protected activity. Presently before the Court is Acosta's Motion for Summary Judgment (Docket No. 27) and brief in support (Docket No. 28), the brief in opposition filed by Plaintiff (Docket No. 35), and Acosta's reply (Docket No. 38). In addition to the motion and briefs, the Court has considered the parties' concise statements and counter statements of material facts, and the appendices that were filed in connection with the briefs (Docket Nos. 29, 30, 34, 36, 37, 39).

For the reasons that follow, Acosta's motion is denied.

1

## II. RELEVANT FACTS[1]

As the parties are well-acquainted with the factual background of this case, at this juncture the Court will present an abbreviated version of the facts relevant to Acosta's summary judgment motion. In July 2017, Acosta hired Plaintiff as a Business Manager. (Docket Nos. 29, ¶ 1; 34, ¶ 1). Plaintiff was hired as part of a sales force that was exclusively dedicated to the C-Fresh/Bolthouse ("C-Fresh") brand that Acosta had recently acquired. (Docket Nos. 29, ¶ 3; 34, ¶ 3). After working exclusively on the C-Fresh brand for a period of time, Plaintiff was also assigned to other accounts. (Docket Nos. 29, ¶¶ 20, 21; 34, ¶¶ 20, 21). In November 2018, Plaintiff switched from reporting to Sue Colombo in New York, to reporting to John McCloskey in Acosta's Pittsburgh office. (Docket Nos. 29, ¶¶ 11, 18; 34, ¶¶ 11, 18). In early 2019, when Acosta restructured its management positions, McCloskey transitioned from a Director position to a Business Manager position, and Plaintiff and other Business Managers in the Pittsburgh office began reporting to John Greer, Senior VP for the Eastern Great Lakes region, which includes Pittsburgh. (Docket Nos. 29, ¶¶ 7, 26, 27; 34, ¶¶ 7, 26, 27).

In late January 2019, Greer and McCloskey met with Plaintiff when Plaintiff began reporting to Greer. (Docket Nos. 29, ¶ 33; 34, ¶ 33). During that meeting, they discussed the issue of Pittsburgh employees working from the office rather than remotely, as Plaintiff had primarily been doing. (Docket Nos. 29, ¶¶ 13, 19, 31, 33; 34, ¶¶ 13, 19, 31, 33, 34). Plaintiff was unhappy with the requirement of working from the office, and she explained that she was responsible for balancing her work and her obligations related to caring for her three young children. (Docket No. 29, ¶ 34; 34, ¶ 34). Greer had no concerns with Plaintiff's performance and found her to be highly

---

[1] The factual background is derived from the undisputed evidence of record, and the disputed evidence is viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

skilled and good at her job. (Docket No. 29, ¶ 30; 34, ¶ 30). During that meeting, however, Greer asked Plaintiff to explain her daily routine juggling her kids and her work from home. (Docket Nos. 36, ¶ 54; 39, ¶ 54). Greer said that he understood what it takes to manage three young kids because he had three kids himself "with a wife that worked," so he understood "what can transpire" and that it is challenging. (Docket Nos. 36, ¶ 56; 39, ¶ 56). Greer also admitted that he was concerned as to how Plaintiff was going to manage her business responsibilities while managing her childcare responsibilities as well. (Docket Nos. 36, ¶ 55; 39, ¶ 55).

In the course of that meeting, Plaintiff told Greer that she was uncomfortable with their conversation and that she wanted to speak to Human Resources. (Docket Nos. 36, ¶ 67; 39, ¶ 67). Plaintiff contacted Colombo (to whom she had previously reported) after the meeting and told Colombo how uncomfortable she felt with the conversation regarding her responsibilities at home and the tone that Greer had used regarding the expectations of her job. (Docket Nos. 36, ¶ 70; 39, ¶ 70). Plaintiff also told James Falk (the Acosta Director who was responsible for managing the C-Fresh business for the East) that she felt Greer was insulting toward working mothers when Greer spoke with her about working in the office. (Docket Nos. 36, ¶¶ 7, 71; 39, ¶¶ 7, 71).

In March 2019, Plaintiff contacted Toni Gerwitz, Acosta Human Resources Business Partner. (Docket Nos. 1, ¶ 14; 8, ¶ 14; 36, ¶¶ 25, 72; 39, ¶¶ 25, 72). Plaintiff testified in deposition that she told Gerwitz that there was not a lot of diversity on Greer's team, that she was the only working mother on the team at the time, and that she felt Greer was discriminating against her because of her childcare responsibilities. (Docket Nos. 36, ¶ 72; 39, ¶ 72). In deposition, Gerwitz testified that she does not recall Plaintiff making these specific statements, but she acknowledged that Plaintiffs' concerns about Greer related to her home or familial obligations. (Docket Nos. 36, ¶¶ 72, 73; 39, ¶¶ 72, 73). Despite the concerns that Plaintiff expressed to Human Resources, no

one from Human Resources ever talked with McCloskey about the meeting between Plaintiff and Greer in which they discussed Plaintiff working from home. (Docket Nos. 36, ¶ 74; 39, ¶ 74).

Plaintiff asserts that on May 1, 2019, she told Greer that she was pregnant. (Docket No. 1, ¶ 18). Greer testified in deposition that he thinks he learned that Plaintiff was pregnant "just in passing" because people were talking about it in the office, but that Plaintiff never told him directly that she was pregnant. (Docket Nos. 36, ¶¶ 60-62; 39, ¶¶ 60-62). However, Gerwitz testified in deposition that in early May Greer called her, told her that Plaintiff was in the office for a meeting, and said that Plaintiff had told him that she was pregnant. (Docket Nos. 36, ¶¶ 63, 64; 39, ¶¶ 63, 64). In contrast, Greer told the Equal Employment Opportunity Commission ("EEOC") that he was not aware that Plaintiff was pregnant in May 2019. (Docket Nos. 36, ¶ 59; 39, ¶ 59).

In any event, Greer made the decision to terminate Plaintiff in approximately mid-May 2019. (Docket Nos. 34, ¶ 60; 37-4 at 32). On May 28, 2019, Greer advised Plaintiff that she was being laid off due to corporate restructuring. (Docket Nos. 1, ¶ 22; 8, ¶ 22). When Plaintiff was terminated, Acosta retained all the other employees on Greer's team, of which Plaintiff was the only working mother with young children. (Docket Nos. 36, ¶¶ 36, 72; 39, ¶¶ 36, 72).

Plaintiff initiated this lawsuit on April 12, 2021, after having satisfied all procedural and administrative prerequisites involving the EEOC and the Pennsylvania Human Relations Commission. (Docket No. 1). On January 4, 2022, after the discovery period had closed in this case, the parties filed a Joint Stipulation dismissing with prejudice three of Plaintiff's six claims (Counts III, IV, and VI). (Docket No. 23). Thus, the following claims in Plaintiff's Complaint remain unresolved: (1) Title VII Discrimination – Termination – based on sex and pregnancy (Count I); (2) Title VII Retaliation – Termination – based on complaints of sex and pregnancy discrimination (Count II); and (3) PHRA Claims mirroring Counts I and II (Count V). (Docket

No. 1 at 5-7, 10-11). As explained, *supra*, Acosta filed its Motion for Summary Judgment, which has been fully briefed by the parties, and the motion is now ripe for decision.

### III. STANDARD OF REVIEW

Summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). To withstand summary judgment, an issue of fact in dispute must be both genuine and material, *i.e.*, one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a summary judgment motion, the court may not weigh the evidence or make credibility determinations, but rather is limited to deciding whether there are any disputed issues that are both genuine and material. *See id.* at 249.

If the moving party carries its burden under Rule 56, the non-movant must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations or mere suspicions in attempting to survive summary judgment. *See Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citing *Celotex*, 477 U.S. at 325). The non-movant must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the nonmoving party will bear the burden of proof at trial." *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994) (citation omitted).

### IV. ANALYSIS

Title VII prohibits employment discrimination because of, *inter alia*, an individual employee's sex. *See* 42 U.S.C. § 2000e–2(a). The Pregnancy Discrimination Act ("PDA") is an

amendment to Title VII stating that the terms "because of sex" or "on the basis of sex" "include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). Pursuant to the PDA, "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes." *Id.* Title VII also prohibits employers from discriminating or retaliating against employees for complaining about harassment or discrimination in the workplace. *See* 42 U.S.C. § 2000e-3(a).

Absent direct evidence of discrimination or retaliation, as in this case,[2] Title VII discrimination and retaliation claims are analyzed according to the well-known burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 804 (1973): (1) first, the plaintiff must establish a *prima facie* case of discrimination or retaliation; (2) the burden then shifts to the employer to advance a legitimate, non-discriminatory or non-retaliatory reason for the adverse employment action; and (3) finally, the plaintiff is afforded an opportunity to show that the employer's proffered reason was a pretext for discrimination or retaliation.[3] *See Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006).

### A. *Prima Facie* Case Analysis

In responding to Acosta's summary judgment motion, Plaintiff emphasizes at the outset that her Complaint includes allegations of discrimination because of her status as a working mother with young children, otherwise referred to as "sex-plus" discrimination, as well as allegations of discrimination because of her pregnancy and allegations of retaliation for engaging in protected

---

[2]  Evidence is direct if "it demonstrates that the decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998) (internal quotation marks and citation omitted). No such direct evidence exists in this case.

[3]  Similar claims arising under both Title VII and the PHRA, such as Plaintiff's claims here, are analyzed coextensively. *See Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006).

activity. Notably, in moving for summary judgment, Acosta focuses on Plaintiff's claims of discrimination based on pregnancy and retaliation, but it does not specifically address Plaintiff's claim of sex-plus discrimination based on her status as a working mother with young children.

### 1. Plaintiff's *Prima Facie* Case of Sex Discrimination

Sex-plus discrimination claims allow employees to advance sex discrimination claims even if all members of the sex are not discriminated against, *i.e.*, an employer who treats women with small children differently than women without small children can be liable for sex-plus discrimination (with the "plus" indicating stereotypical assumptions about women's childcare responsibilities). *See Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971); *Weightman v. Bank of New York Mellon Corp.*, 772 F. Supp. 2d 693, 701-02 (W.D. Pa. 2011). No special standards apply to sex-plus discrimination, which is just a form of sex discrimination. *See Weightman*, 772 F. Supp. 2d at 701-02. To establish a *prima facie* case of sex discrimination, a plaintiff must show that: (1) she is part of a protected class; (2) she was qualified for her position; (3) despite these qualifications, she was terminated; and (4) she was replaced by a member of a non-protected class or someone in a non-protected class, otherwise similarly situated, was treated more favorably. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Hicks v. Arthur*, 878 F. Supp. 737, 738 (E.D. Pa.), *aff'd*, 72 F.3d 122 (3d Cir. 1995).

Plaintiff argues that she can clearly establish her *prima facie* case of sex discrimination here. First, Plaintiff is a member of a protected class, and she had three young children and was pregnant with her fourth child at the time of her termination. Second, it is undisputed that Plaintiff was qualified for her position since Greer had no concerns about her performance and found her to be highly skilled and qualified for her job. (Docket Nos. 29, ¶ 30; 34, ¶ 30). Third, it is undisputed that Acosta terminated Plaintiff's employment. Fourth, when Plaintiff's employment

was terminated, Acosta retained all the other employees on Greer's team, of which Plaintiff was the only working mother with young children. (Docket Nos. 36, ¶¶ 36, 72; 39, ¶¶ 36, 72). Upon consideration of the evidence presented, the Court finds that Plaintiff has established all four *prima facie* elements of sex, or sex-plus, discrimination here.

### 2. **Plaintiff's *Prima Facie* Case of Pregnancy Discrimination**

To establish a *prima facie* case of pregnancy discrimination, a plaintiff must show that: (1) she was pregnant, and her employer was aware of her pregnancy; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) there is a causal nexus between her pregnancy and the adverse employment action. *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008). For purposes of summary judgment, Acosta does not dispute that Plaintiff has satisfied the first, second, and third *prima facie* elements of pregnancy discrimination. Acosta does contend, however, that Plaintiff has failed to establish the fourth requisite element, a causal connection between her pregnancy and her layoff.

A causal connection can be established by showing that Plaintiff was treated less favorably than similarly situated employees who are not in her protected class. *See id.* at 366 (citing *Iadimarco v. Runyon*, 190 F.3d 151, 162 (3d Cir. 1999), and *In re Carnegie Ctr. Assocs.*, 129 F.3d 290, 297 (3d Cir. 1997)). Upon review of the undisputed material facts here, the Court notes that Plaintiff was the only person on Greer's team who was terminated in Spring 2019, and she was thus treated less favorably than the other Business Managers who were not pregnant, or in her protected class. (Docket Nos. 36, ¶¶ 36, 72; 39, ¶¶ 36, 72). The Court therefore finds that Plaintiff has shown the fourth element of a causal connection and, accordingly, she has established her *prima facie* case of pregnancy discrimination.

### 3. Plaintiff's *Prima Facie* Case of Retaliation

To establish a *prima facie* case of retaliation, a plaintiff must establish that: "'(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'" *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).  While Acosta does not dispute that Plaintiff was terminated and can therefore establish the second *prima facie* element of retaliation, Acosta does argue that Plaintiff cannot satisfy the first and third elements of such claim.

First, Acosta contends that Plaintiff did not engage in protected activity because her complaints and discussions with management at Acosta did not rise to such level.  As set forth, *supra*, during their meeting about working in the office or remotely, Plaintiff told Greer that she was not comfortable with their conversation and wanted to speak to Human Resources.  (Docket Nos. 36, ¶ 67; 39, ¶ 67).  Plaintiff spoke to various supervisory individuals at Acosta, and she reported to Gerwitz in Human Resources that there was a lack of diversity on Greer's team, that she was the only working mother on the team, and that she felt that Greer was discriminating against her because of her childcare responsibilities.  (Docket Nos. 36, ¶¶ 70-73; 39, ¶¶ 70-73).  Under these undisputed facts, as well as the disputed facts viewed in the light most favorable to Plaintiff, the Court finds that Plaintiff's statements to Greer and Gerwitz in opposing Greer's treatment of and attitude toward working mothers constitute protected activity.  *See, e.g., Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (explaining that protected activity includes formal charges of discrimination "as well [as] informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers,

protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges"). Plaintiff has therefore satisfied the second element of her *prima facie* case of retaliation.

Acosta also argues that Plaintiff cannot satisfy the third element of her *prima facie* case of retaliation, that there was a causal connection between her protected activity and her termination. However, a plaintiff may rely on "a broad array of evidence" to show the requisite causal link. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (internal quotation marks and citation omitted). With regard to establishing a causal connection, the Court of Appeals for the Third Circuit has indicated as follows:

> To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. In the absence of that proof the plaintiff must show [(3)] that from the evidence gleaned from the record as a whole the trier of the fact should infer causation.

*Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (internal quotation marks and citations omitted); *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (finding that timing plus other evidence may be an appropriate test to determine causation if temporal proximity is not so close as to be unduly suggestive). In sum, a plaintiff must produce evidence "sufficient to raise the inference that her protected activity was the *likely reason* for the adverse [employment] action." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017) (emphasis in original) (internal quotation marks and citation omitted).

Plaintiff concedes that the timing of her protected activity in relation to Greer's decision to terminate her involves a period of two to three months, which may be – if viewed alone – insufficient to establish causation. However, Plaintiff argues that the Court should consider the circumstances as a whole in this situation, and that the Court should find such timing – along with

the significant inconsistencies and contradictions in Acosta's articulated rationale for eliminating Plaintiff's position – sufficient to show the *prima facie* element of causation. Upon consideration of such evidence (which is specifically discussed at length, *infra*, at Section IV.C, since it is similarly relevant to the determination of whether Acosta's articulated rationale for terminating Plaintiff is pretextual), the Court agrees with Plaintiff's position and finds that Plaintiff has sufficiently shown evidence that her protected activity was the likely reason for her termination, the third element of her *prima facie* case of retaliation. *See Collins v. Kimberly-Clark Pa., LLC*, 247 F. Supp. 3d 571, 603 (E.D. Pa.), *aff'd*, 708 F. App'x 48 (3d Cir. 2017) (stating that a court should "consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action" (internal quotation marks and citation omitted)). Accordingly, the Court finds that Plaintiff has sufficiently stated her *prima facie* case of retaliation.

### B. Acosta's Articulated Legitimate, Non-Discriminatory Reason

Because Plaintiff has met her *prima facie* burden at the first step of *McDonnell Douglass* for her claims of sex and pregnancy discrimination and retaliation, the Court moves on to the second step of the burden-shifting analysis. At the second step of *McDonnell Douglas*, an employer's burden of production is relatively light and is satisfied by introducing evidence which, taken as true, would permit the conclusion that there was a legitimate, non-discriminatory reason for the unfavorable employment decision at issue. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Here, Acosta asserts that it terminated Plaintiff's employment because of a reduction in force related to Acosta's loss of the C-Fresh account on which Plaintiff worked. Plaintiff does not argue that Acosta's articulated reason is insufficient to meet its burden at the second step of

the burden-shifting analysis, and the Court agrees.

As the Court finds that Acosta has introduced evidence that could permit a fact finder to conclude that there was a legitimate, non-discriminatory reason for laying off Plaintiff, the burden shifts to Plaintiff to show that Acosta's proffered reason is pretextual.

### C. **Acosta's Proffered Reason as Pretext for Sex and Pregnancy Discrimination and Retaliation**

Given that Acosta has met its burden at step two of *McDonnell Douglas* for each of Plaintiff's claims, the burden shifts back to Plaintiff to show that Acosta's stated reason for the adverse employment action was pretext for sex and pregnancy discrimination and retaliation. To defeat summary judgment at the pretext stage, a plaintiff must proffer some evidence from which a factfinder could reasonably either: "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764 (setting forth the now-familiar two-prong pretext analysis) (internal citations omitted).

Under the first prong of *Fuentes*, a plaintiff must present evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered reasons "that a reasonable factfinder *could* rationally find them unworthy of credence," and infer that the defendant did not act for the stated non-discriminatory reasons. *Id.* at 765 (emphasis in original) (internal quotation marks and citations omitted). To the extent that a plaintiff disagrees with an employer's decision, simply arguing that the employer was wrong is not enough to survive summary judgment. *See id.* (*e.g.,* a plaintiff cannot simply show that the employer's decision was wrong or mistaken).

A plaintiff still might demonstrate pretext under the second prong of *Fuentes* if she can demonstrate that discrimination "was more likely than not a motivating or determinative cause of

12

the adverse employment action." *Id.* at 762. Pretext can be shown in this way by producing evidence that: 1) the employer previously has discriminated against the plaintiff; 2) the employer has discriminated against other persons; or 3) the employer has treated more favorably similarly situated employees outside of the plaintiff's protected class. *See id.* at 765.

In sum, to meet her burden here, Plaintiff must point to evidence from which a factfinder may reasonably disbelieve Acosta's stated reason for its action. Plaintiff argues that the record in this case contains evidence of pretext under both prongs of *Fuentes*.

### 1. First Prong of *Fuentes*: Acosta's Rationale Is Unworthy of Credence

Plaintiff argues, under the first prong of *Fuentes*, that the inconsistencies and contradictions in the testimony regarding her termination make Acosta's proffered rationale for her layoff unworthy of belief for a number of reasons, including the following: (1) the assertion that Acosta terminated Plaintiff's employment because it lost the C-Fresh business is weak, implausible, and contradicted by evidence of record; (2) Acosta did not terminate the employment of the male Business Manager assigned to its Clorox account, even though Acosta was notified in April 2019 that it would lose that business; and (3) there are inconsistencies in the record as to the alleged reduction in force at Acosta.

#### a. Acosta's Loss of the C-Fresh Business

Acosta asserts that Plaintiff's employment was terminated because of a reduction in force related to Acosta's loss of the C-Fresh business on which Plaintiff worked. Plaintiff argues, however, that such explanation is weak, implausible, and contradicted by the evidence of record. For instance, Plaintiff points out that Greer testified that Acosta was notified in April 2019 that the C-Fresh business would go away in a couple of months, yet he also admitted that he does not know for a fact when such notification occurred, and that "April just rings a bell" for him. (Docket Nos.

36, ¶¶ 3, 4; 39, ¶¶ 3, 4).  Greer also could not identify who informed him that Acosta was losing the C-Fresh business, and Falk confirmed that C-Fresh was not sold until the end of June 2019.  (Docket Nos. 36, ¶¶ 5, 7, 8; 39 ¶¶ 5, 7, 8).  Furthermore, the evidence of record shows that Acosta retained C-Fresh as a client through October 2019, and that there was no change in Acosta's service to C-Fresh or in Acosta's income from C-Fresh during that time.  (Docket Nos. 36, ¶¶ 10-12; 39, ¶¶ 10-12).  In fact, Plaintiff indicates that the only document Acosta produced related to the date of the loss of the C-Fresh business is an email dated October 1, 2019, notifying Acosta that C-Fresh would not be extending its agreement with Acosta beyond October 31, 2019.  (Docket Nos. 36, ¶ 13; 39, ¶ 13).

### b. Plaintiff's Male Team Member Was Not Terminated

Plaintiff has shown evidence that, although Acosta claims that Plaintiff's employment was terminated because of a reduction in force related to the loss of the C-Fresh business (the relevant dates of which are in dispute), Acosta was also notified on April 1, 2019, that its Clorox business (which Greer described as a more valuable client than C-Fresh) would be terminated effective July 1, 2019.  (Docket Nos. 36, ¶¶ 50, 53; 39, ¶¶ 50, 53).  Nevertheless, unlike Plaintiff (who was supposedly terminated due to the loss of the account on which she was working), the male Business Manager on Greer's team who was assigned to the Clorox business, Matt Evanek, was not terminated.  (Docket Nos. 36, ¶¶ 51, 52; 39, ¶¶ 51, 52).  In fact, Greer assigned the C-Fresh business to Evanek after he terminated Plaintiff's employment.  (Docket Nos. 36, ¶ 55; 39, ¶ 55).

### c. Inconsistencies Regarding the Reduction in Force

Plaintiff also argues that, although Acosta claims that her employment was terminated as part of a reduction in force at the company, the evidence of record regarding that alleged reduction is weak, implausible, and inconsistent.  Plaintiff notes that, according to Greer, he received a

14

corporate directive to reduce the workforce because the C-Fresh business was going away, yet the earliest indication of such directive that Acosta has produced is from October 1, 2019 (notifying that the business relationship with C-Fresh would end effective October 31, 2019), Greer does not remember who told him that he needed to reduce the workforce, and Greer does not remember when he received such directive to reduce the workforce. (Docket Nos. 36, ¶¶ 13, 15-17; 39, ¶¶ 13, 15-17). Greer also does not recall being told to reduce the workforce by a certain budget/dollar amount, and Plaintiff indicates that Acosta has not produced any documents related to a directive to reduce the workforce which were given to Greer or to anyone else during the relevant time period. (Docket Nos. 36, ¶ 18; 39, ¶ 18).

Plaintiff further indicates that, while Greer does not recall the name of the individual who told him to reduce the workforce, he testified that such a directive would typically come from the person to whom someone reports. (Docket Nos. 36, ¶ 19; 39, ¶ 19). At the time Plaintiff's employment was terminated, Plaintiff reported to Greer, who reported to John Bierfeldt, Senior VP of the Northeast Region; and according to Bierfeldt, he was told to eliminate a certain percentage of cost by his boss, Bill Chiodo. (Docket Nos. 36, ¶¶ 20, 21; 39, ¶¶ 20, 21). Chiodo, however, was separated from Acosta approximately in late 2018 or early 2019, long before Plaintiff's termination. (Docket Nos. 36, ¶ 22; 39, ¶ 22). Although Bierfeldt testified that he would have told Greer to make a reduction in force commensurate with a C-Fresh exit and termination letter, he had no evidence showing that C-Fresh notified Acosta prior to October 1, 2019, that it would not be extending its agreement with Acosta. (Docket Nos. 36, ¶¶ 23, 24; 39, ¶¶ 23, 24).

Plaintiff also points to evidence indicating that Acosta's senior level employees were unaware of the alleged reduction in force that included Plaintiff's termination. Gerwitz, a Human

Resources Business Partner, does not know whether anyone instructed Greer to eliminate any employees in Spring 2019; Bierfeldt, a Senior VP, never heard any reference to the cost-saving initiative allegedly named "Project June;" Colombo, a VP, was not aware of any corporate restructuring in Spring 2019; and Falk, a Director, was not aware of any corporate restructuring. (Docket Nos. 36, ¶¶ 25, 27, 28, 32, 33; 39, ¶¶ 25, 27, 28, 32, 33). Also, at the time of her termination, Plaintiff was still working on the C-Fresh business, and no one had spoken with Falk (who oversaw the C-Fresh business) about the possibility of terminating Plaintiff. (Docket No. 36, ¶¶ 12, 14; 39, ¶¶ 12, 14).

Furthermore, Greer could not identify anyone aside from Plaintiff whose employment was terminated because Acosta lost the C-Fresh business, it is undisputed that no one else on Greer's team was laid off in May 2019, and Falk could not remember anyone other than Plaintiff being separated as part of any reduction in force in May 2019. (Docket Nos. 36, ¶¶ 34-36; 39, ¶¶ 34-36). Although Bierfeldt testified that he gave an instruction to reduce the workforce across the entire Northeast hub Region (not just to Greer), he is not aware of anyone else across the entire Northeast hub – other than Plaintiff – whose employment was terminated. (Docket Nos. 36, ¶¶ 37-39; 39, ¶¶ 37-39).

Moreover, Plaintiff has shown evidence that, although Acosta argues that it terminated Plaintiff as part of a reduction in force (a cost-saving measure), Acosta simultaneously hired other Business Managers in its Northeast Region around the time of her termination. Specifically, Acosta hired Jim Biedler as a Business Manager on May 28, 2019 (the day before it terminated Plaintiff), and it hired Keith Besz and William Fitzgerald as Business Managers on May 29, 2019 (the same day that it terminated Plaintiff). (Docket Nos. 36, ¶¶ 40-42; 39, ¶¶ 40-42). Notably, Acosta's witnesses agreed that Plaintiff was qualified for the Business Manager positions for

16

which Acosta hired Biedler, Besz, and Fitzgerald. (Docket Nos. 36, ¶ 46; 39, ¶ 46). Nevertheless, in June 2019 (less than a month after terminating Plaintiff's employment), Acosta also posted job openings for two Business Manager positions in the Pittsburgh office and one Business Manager position in the Buffalo office (both of which are part of Acosta's Eastern Great Lakes Region, for which Greer has responsibility). (Docket Nos. 36, ¶¶ 48, 49; 39, ¶¶ 48, 49). Plaintiff emphasizes that Acosta's witnesses were unable to explain why the company allegedly terminated Plaintiff's employment on May 29, 2019, as part of a reduction in force, yet it also hired and posted a number of Business Manager positions within the following four weeks. (Docket Nos. 36, ¶¶ 43-45; 39, ¶¶ 43-45).

### d.  Summary:  Pretext Under Prong One of *Fuentes*

In light of the above-described inconsistencies and contradictions in the evidence of record, the Court finds that Plaintiff has pointed to sufficient evidence of record to show that a reasonable factfinder could determine that Acosta's stated reason for the termination of Plaintiff's employment – that her employment was terminated as part of a reduction in force related to Acosta's loss of the C-Fresh business – is unworthy of credence. Accordingly, the Court finds that Plaintiff has met her burden of showing, under the first prong of *Fuentes*, evidence that Acosta's proffered reason for her termination is pretext for sex and pregnancy discrimination and retaliation.

### 2.  Second Prong of *Fuentes*:  Evidence of an Invidious Discriminatory Reason

Plaintiff also argues, under the second prong of *Fuentes*, that a factfinder reasonably could determine that an invidious discriminatory reason was more likely than not a motivating or determinative factor in Acosta's decision to terminate her, based on the following evidence: (1) Greer admittedly had concerns about Plaintiff's childcare responsibilities and the impact of those responsibilities on her work (indicating that Plaintiff's sex was a motivating factor in the

17

termination of her employment); and (2) Greer made the decision to terminate Plaintiff's employment within weeks of learning that she was pregnant (indicating that Plaintiff's pregnancy was a motivating or determinative factor in the termination of her employment).

### a. Concern About Plaintiff's Childcare Responsibilities

In arguing that the evidence shows that sex was a motivating or determinative factor in the employment decision at issue here, Plaintiff cites (as discussed, *supra*) evidence indicating that, during their meeting in late January 2019, Greer asked Plaintiff to explain her daily routine juggling her kids and her work, and that Greer admitted his concern as to how Plaintiff was going to manage both her work responsibilities and her childcare responsibilities. (Docket Nos. 36, ¶¶ 54, 55; 39, ¶¶ 54, 55). Greer also noted that he understood what it takes to manage three young kids because he had three kids himself "with a wife that worked," so he understands "what can transpire" and that it is challenging. (Docket Nos. 36, ¶ 56; 39, ¶ 56) Greer admittedly wanted Plaintiff to work in the office because he had concerns about her childcare responsibilities, and his chief concern was how Plaintiff could manage both her children and the business that Acosta was paying her to manage. (Docket Nos. 36, ¶¶ 57, 58; 39, ¶¶ 57, 58). The evidence also shows that Greer's concerns were not based on any alleged performance deficiencies of Plaintiff or on any alleged failure on the part of Plaintiff to perform her job duties. (Docket Nos. 29, ¶ 30; 34, ¶ 30).

Therefore, Plaintiff argues that Greer's comments about Plaintiff's childcare responsibilities, and Greer's subsequent admission that he had concerns about those responsibilities during the time in which he was making the decision to terminate Plaintiff's employment, show that Greer was using stereotypical assumptions regarding women's childcare responsibilities in his decision-making. Upon consideration, the Court agrees that such comments and admissions constitute evidence with sufficient probative force that a reasonable factfinder

could conclude by a preponderance of the evidence that Plaintiff's sex was a motivating or determinative factor in the employment decision at issue here. Plaintiff has thus met her burden to show evidence indicating that Acosta's proffered rationale for terminating Plaintiff's employment was pretext for sex discrimination under the second prong of *Fuentes*.

### b. Plaintiff's Termination Soon After Learning of Her Pregnancy

In arguing that the evidence shows that pregnancy was also a motivating or determinative factor in the employment decision at issue here, Plaintiff cites (as discussed, *supra*) evidence indicating that Greer's testimony has been inconsistent and disingenuous regarding his knowledge of Plaintiff's pregnancy. Specifically, Plaintiff notes that Greer initially told the EEOC that he was not aware that Plaintiff was pregnant in May 2019. (Docket Nos. 36, ¶ 59; 39, ¶ 59). In deposition testimony given in discovery in this case, however, Greer stated that he learned of Plaintiff's pregnancy "just in passing" through people chatting about it in the office, and Gerwitz testified in deposition that Greer called her in early May and told her that Plaintiff was in the office for a meeting and that Plaintiff had told him that she was pregnant. (Docket Nos. 36, ¶¶ 60, 63, 64; 39, ¶¶ 60, 63, 64). Although Greer denies it, Plaintiff has consistently maintained that she told him directly on May 1, 2019, that she was pregnant. (Docket Nos. 36, ¶ 65; 39, ¶ 65). Additionally, Greer testified in deposition that he made the decision to terminate Plaintiff's employment in approximately mid-May 2019. (Docket Nos. 34, ¶ 60; 36, ¶ 66; 39, ¶ 66).

Plaintiff argues that such evidence – that Greer made the decision to terminate Plaintiff's employment within just a couple of weeks of learning that she was pregnant – is of sufficient probative force that a reasonable factfinder could conclude that Plaintiff's pregnancy was a motivating or determinative factor in the employment decision at issue here. Upon consideration, the Court agrees with Plaintiff, and finds that Plaintiff has thus met her burden to show evidence

indicating that the rationale for the termination of her employment proffered by Acosta (that Plaintiff's employment was terminated due to a reduction in force related to the loss of the C-Fresh business) is pretext for pregnancy discrimination under the second prong of *Fuentes*.

## V.     CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Docket No. 27) is denied.

An appropriate Order follows.

> *W. Scott Hardy*
> W. Scott Hardy
> United States District Judge

Date:   March 30, 2023

cc/ecf:   All counsel of record